IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

NATHAN VAN BUREN,

            Defendant.

CRIMINAL CASE NO.

1:16-CR-00243-ODE-JFK

## **REPORT AND RECOMMENDATION**

Pending before the court is Defendant Nathan Van Buren's motion [Doc. 13] to suppress statements.  Defendant contends that the statement he made to agents of the Pubic Corruption Squad of the Federal Bureau of Investigation ("FBI"), on September 3, 2015, is inadmissible because it was obtained in violation of the Supreme Court's decision in Garrity v. New Jersey, 87 S. Ct. 616 (1967), and because the statement was involuntary.  [Docs. 13 and 23].  The Government opposes the motion to suppress contending that Defendant did not establish that Garrity is applicable in this case and that Defendant's statement was made freely and voluntarily.  [Doc. 24].  A hearing was conducted on the motion to suppress on September 21, 2016.[1]  [Doc. 19].  After

---

[1]Citations to the transcript of the hearing are:  (Tr. at ).

AO 72A
(Rev.8/8
2)

consideration of the totality of the circumstances, the court finds that Defendant's statement was made freely and voluntarily without threat of discipline in his employment or of termination from his employment.

## I.    Facts

In 2015, after receiving information from the Cumming Police Department, agents of the FBI Public Corruption Squad, particularly, FBI Agent Brent A. Hervey and Georgia Bureau of Investigation ("GBI") Agent Rock Bigham, on assignment to the squad, investigated allegations that Defendant, a Sergeant in the Cumming Police Department, had corruptly obtained monies from an arrestee.  (Tr. at 3-5, 14-16, 31-32).  The agents decided to conduct an interview with Defendant.  Being aware that Defendant had been placed on administrative leave or suspension by the police department the morning of September 3, 2015, and would be at his residence, the agents traveled there to attempt to talk to Defendant.  (Tr. at 5-6).  The agents knew that the police department had wanted to "get rid of [Defendant] two weeks prior" to the date of the interview but asked the department to delay taking any action to allow the FBI to complete the criminal investigation.  (Tr. at 16-17).

At approximately 2:40 p.m. on September 3, 2015, Agents Hervey and Bigham arrived at Defendant's residence and knocked on the door.  (Tr. at 5, 16, 32).  Agent

AO 72A
(Rev.8/8
2)

Bigham had a recording device and, without Defendant's knowledge, recorded the conversation with him.  (Tr. at 5-9; Gov't Exh. 1; Gov't Exh. 2).[2]  When Defendant answered the door, the agents identified themselves and asked to enter to speak with Defendant; he invited the agents inside.  The three men sat around the dining room table for most of the interview.  (Tr. at 5-6, 9-10, 16-17, 32).  The agents did not restrain or handcuff Defendant and did not restrict his movements.  (Tr. at 10, 32-33).  Defendant was advised several times that he was not under arrest, and he was not arrested at the end of the interview.  (Tr. at 11, 13, 17-18, 33-34).  Although armed, the agents' weapons were concealed under clothing and were not brandished or displayed during the interview.  (Tr. at 10, 33).  The agents did not threaten Defendant nor make him any promises, and the agents' tone was conversational.  (Tr. at 11, 34).  Defendant did not appear to be under the influence of drugs or alcohol, and his answers were responsive to the questions being asked.  (Tr. at 12, 34).

According to the transcript of the interview and the agents' recollections of the interview, Defendant initially mentioned to the agents that he "just found out about

---

[2]A transcript of the recording of the interview was offered at the evidentiary hearing (Gov't Exh. 2); however, counsel for the parties agreed that it contained some transcription errors and that a revised transcript, approved by both parties, would be submitted after the hearing.  (Tr. at 7-9).  The revised transcript (Gov't Exh. 2 Rev'd) will be relied on by the court.

AO 72A
(Rev.8/8
2)

this" and that he had "no clue what it's even about" and that he had not yet contacted a PBA attorney.[3]  (Gov't Exh. 2 Rev'd at 2).  Agent Bigham stated that the agents might be able to help Defendant understand.[4]  (Id.).  Agent Bigham explained that a complaint was filed with the Cumming Police Department who had contacted them, Agent Bigham with the GBI and Agent Hervey with the FBI, about the complaint.  (Id. at 2-3).  The agent then advised Defendant about his <u>Garrity</u> rights, explaining that they were conducting a criminal investigation into the complaint, that whether Defendant spoke to the agents or not had no bearing on the police department's internal investigation, and that Defendant had "every right not to talk to us and your cooperation is completely voluntary . . . ."  (Id. at 3).  Agent Bigham then stated that the complaint to the police department originated from some females about alleged extortion and death threats and asked Defendant if he knew anything about the complaint.  (Id.).  Defendant immediately identified the name of the male, Andrew Albo, at the center of the investigation.  (Id.).

---

[3]Although not explained at the hearing, the court understands "PBA" to be a reference to a union-type representative entity for Cumming Police Department employees.

[4]The transcript identifies two speakers besides Defendant (Sgt. Van Buren), "Agent" and "FBI Agent."  (Gov't Exh. 2 Rev'd).  Accordingly, the court understands "Agent" to be GBI Agent Bigham and "FBI Agent" to be FBI Agent Hervey.

4

Defendant answered the agents' questions about his official involvement in the complaints filed by the females and by Albo but denied any other association with the two females and Albo beyond his role as a Sergeant at the police department.  (Id. at 4-20).  When Defendant persisted in denying other involvement with these individuals, Agent Hervey advised Defendant that the agents had been watching him for a few months and stated, "You're lying to us."  (Id. at 20-21).  When Defendant asked lying about what, the agent stated, "You know how this works.  You can either continue to lie to us or you can cooperate with us.   We've been listening to your calls.  We've been watching you, we've been following you.  I need you to start telling us the truth."[5]  (Gov't Exh. 2 Rev'd at 21).  The agent, focusing on Albo, then continued to ask Defendant questions, which he answered truthfully.  (Id. at 21).

When asked by Agent Hervey why he had lied and was told "this is your chance," Defendant asked if he should contact "PBA[,]" and the following exchange took place:

_____

[5]Agent Hervey's reference that Defendant "kn[e]w how this works" apparently is based on his knowledge that Defendant was a seven year veteran and supervisor at the Cumming Police Department and that Defendant had additional prior law enforcement experience.  (Tr. at 12, 18).

5

Bigham:        It's up to you.  I'm just trying to give you a chance to talk to us right now because I want to tell you, mind if I call you Nathan?

Defendant:     Yes.

Bigham:        We've been watching you awhile, for a few months.  We've got against you, pretty strong evidence and Mr. Albo's been arrested as well.  We know everything.  By telling you this, we know everything.  Okay?

Defendant:     Okay.

Bigham:        So let's talk about your all's two relationship and let's talk about what went on.  Let's go ahead and let's get it out on this table.  I think you need to just start being honest with us.

Defendant:     Okay.  I mean is it gonna hurt my chances.  Like what's gonna happen today if I just ask for an attorney?

Bigham:        Here's the deal.  You're a cop, okay.  You know you have every right to do what you want to do.

Defendant:     I understand that.

Bigham:        So I mean if you want to talk to us, we're here.  We're here now.  We want to listen.  We want to hear what your side of the story is.  If you don't want to talk and you want an attorney, you can make that decision.  We can't - we can't guide you, okay?  I don't want to guide you.

Defendant:     Am I going to jail today?

Bigham:        No, sir, you're not.

(<u>Id.</u> at 21-22).  Agent Hervey confirmed that Defendant was not being arrested.  (<u>Id.</u> at 23).  Agent Hervey explained that they tried to be courteous by speaking to Defendant at home alone, without his wife and children around, and not at the police department and then stated that he was going to ask some questions.  (<u>Id.</u> at 23).  Before the agent did so, Defendant began explaining his association with Albo, how he tried to assist Albo and that he asked Albo for money, initially receiving $5,000 in $100 bills.  Defendant contended that money was either a loan or a gift.  (<u>Id.</u> at 23-33).

Defendant also explained that he improperly "ran" a tag number for Albo to identify someone and that he received $1,000.[6]  (<u>Id.</u> at 33-35).  After Defendant admitted running the tag and accepting and keeping the $1,000, he asked, "Should I call my attorney now?"  The following conversation between the agents and Defendant took place:

Hervey:     It's up to you.  You make the decision.

Defendant:   Am I being arrested right now?

---

[6]Agent Hervey initially believed that Defendant was lying about the amount of money in the envelope because, as he explained to Defendant, the agent had placed $2,000 in a sealed envelope for Albo to give to Defendant as part of the investigation. However, when Defendant was adamant about the amount, the agent conceded that Albo could have removed some of the funds.  (<u>Id.</u> at 34-36, 40-42).

7

| | |
|---|---|
| Bigham: | You are not being arrested right now. . . . But I mean you keep - - |
| Defendant: | I'm trying to help out. |
| Bigham: | You keep asking and I want you to feel comfortable and I don't want you to think that we're sitting here trying to force you to talk to us. You make the decisions. Like I told you at the very beginning, your cooperation is voluntary. I mean you are very nice and let us come inside . . . but you know, this is our - I mean you're a cop. You know how it works. We come to you. We want to find out . . . . But you keep asking, so I mean you make that decision. You - |
| Defendant: | I'd like to contact my attorney. . . . The PBA's not gonna help me out on this one. |

(Id. at 36-37).  Agent Hervey advised Defendant not to talk because he said he wanted a lawyer, and the agent stopped the interview stating, "You invoked your rights to an attorney."  (Id. at 37-38).  After giving Defendant a card with the prosecutor's name and number for Defendant's attorney to contact, the agent said, "But I do want to tell you this.  Look at me, Sgt. VanBuren.  And I tell this to everybody.  Don't do anything stupid.  Don't take your life.  It's not worth it."  (Id. at 38).  Defendant responded that he was not, and the agent repeated his cautionary advice.

At this point the agents advised Defendant not to contact anybody or do anything stupid to jeopardize the investigation.  Agent Hervey continued, "So the best

8

thing, like I say, you know how it works, you're a cop.  Whoever comes to the table first wins.  Okay.  We're stopping the interview.  You want a lawyer so I don't want you to say anything else to us, all right." (Id.).  The agents indicated for Defendant to have his attorney contact them and advised that he may financially qualify for an appointed lawyer.  (Id. at 38-39).  Defendant asked a question not captured on the recording, to which Agent Hervey replied, "I can't tell you that.  I can just tell you that we've done a thorough investigation. . . ." (Id. at 39).  Defendant then stated, "Jesus, all for $6,000."  (Id.).

As Defendant and the agents moved towards the front door, while standing in the foyer, the agents engaged in some general conversation explaining that Defendant's wife had been trying to reach him on his work cell phone, which the agent had in his possession, and thanking Defendant for speaking with them and for being honest towards the end, and that he was sorry to meet him under the circumstances.  (Tr. at 23-26, 39; Gov't Exh. 2 Rev'd at 39).  Defendant again mentioned that the PBA probably would not represent him, and Agent Bigham encouraged him to contact them anyway.  Agent Hervey then stated, "Either way [inaudible] make that decision for you.  All I ask of you is continue whatever you do from this point is be honest with us for the rest of the investigation." (Gov't Exh. 2 Rev'd at 40).  Defendant then asked,

AO 72A
(Rev.8/8
2)

"Should I continue talking to you?"  (Id.).  To which Agent Hervey responded, "Do you want to revoke your rights to - continue to talk to us?"  (Id.).  And Defendant stated, "At this time, yes."  (Id.).  So the agents and Defendant returned to the dining room table to continue the interview with Defendant.  (Tr. at 24-26; Gov't Exh. 2 Rev'd at 40-46).

At the end of the interview, Defendant stated, "This cost me my career.  Possibly my family."[7]  (Gov't Exh. 2 Rev'd at 46).  Agent Hervey responded that Defendant would not lose his family and that he was a young man who made a mistake but could still "make something of" himself and again cautioned him not to do anything stupid. The agent suggested that Defendant get an attorney who could speak with the prosecutor, reminded Defendant that decisions would be made by the prosecutor and opined that "as long as you continue to be 100 honest with us will be your best move." (Id. at 46-47).  The agent also advised Defendant that lying to them would hurt him and discussed potential violations of 18 U.S.C. § 1001 for giving a false statement.

---

[7]Both agents testified that Defendant was not nervous or upset during the interview, except, according to Agent Hervey, when Defendant made the statement about throwing his career away for $6,000, Defendant put his face in his hands and was upset.  (Tr. at 17, 30, 39).  It is not clear if Agent Hervey is referencing Defendant's statement, "Jesus, all for $6,000." and/or the statement, "This cost me my career.  Possibly my family."

AO 72A
(Rev.8/8
2)

(Id. at 47-48).  The interview concluded when the agents confirmed that Defendant was not lying to them about the amount of money he received and was not in a position to actively cooperate with other matters involving Albo.[8]  (Tr. at 13, 27; Gov't Exh. 2 Rev'd at 48-52).

Although Agent Hervey could not recall the exact date, sometime after September 3, 2015, he called Defendant and advised that he and another agent were coming to his residence.  (Tr. at 28).  The agent had a target letter for Defendant and delivered and explained it to him while standing with Defendant on his driveway.  (Tr. at 14, 28).  Defendant asked "was that other $5,000 you as well?"  The agent, who understood Defendant to be asking about the first $5,000 Defendant received from the victim, that is, Albo, replied, "yes, it was."  (Tr. at 14, 28-29).

Additional facts will be set forth as necessary during discussion of Defendant's claims.

---

[8]The agents also explained at the end of the interview that other agents had briefly spoken with Defendant's wife to confirm information about Defendant's financial situation but that the agents did not give her any details.  (Tr. at 29; Gov't Exh. 2 Rev'd at 53-54).

AO 72A
(Rev.8/8
2)

## II.   Discussion

### a.   <u>Garrity</u>

Defendant contends that his statement to Agents Hervey and Bigham on September 3, 2015, is inadmissible because it was involuntary under the Supreme Court decision in <u>Garrity</u>.  [Doc. 23 at 7-10].  Consideration of the totality of the circumstances simply does not support Defendant's claim.

As noted, in support of his motion to suppress his statement, Defendant relies on <u>Garrity v. New Jersey</u> and its progeny.  [<u>Id.</u>].  In <u>Garrity</u>, the appellants, public employees, sought to suppress statements that were given to investigators after they were "warned (1) that anything [they] said might be used against [them] in any state criminal proceeding; (2) that [they] had the privilege to refuse to answer if the disclosure would tend to incriminate [them]; but (3) that if [they] refused to answer [they] would be subject to removal from office." 87 S. Ct. at 617.  The Supreme Court determined that the choice provided to appellants, between self-incrimination or job forfeiture, constituted coercion and deprived appellants of their "free choice to speak out or to remain silent."  <u>Id.</u> at 618.  In resolving the question "whether a State, contrary to the requirement of the Fourteenth Amendment, can use the threat of discharge to secure incriminatory evidence against an employee[,]" the Supreme Court

12

AO 72A
(Rev.8/8
2)

held that "the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office . . . ." Id. at 620.  Therefore, a direct threat of economic harm in order to secure a waiver of the right against self-incrimination constitutes coercion and dictates a finding that a statement secured under those circumstances is involuntary and not admissible at trial.

Defendant does not contend, and the record does not support a finding, that the agents directly threatened Defendant with discipline or loss of his employment on September 3, 2015, in order to obtain his statement.  [Doc. 23 at 8-10].  Defendant, instead, contends that the agents used references to the Cumming Police Department's internal investigation in order to indirectly threaten Defendant with economic harm resulting in Defendant's subjective belief, which he contends was objectively reasonable, that his job was threatened if he refused to cooperate.  [Id.].  Defendant is correct in asserting that indirect threats of economic harm are equally as harmful and coercive as direct threats and can result in involuntary waivers of the right against self-incrimination; however, the record before this court is woefully inadequate to support a finding either that Defendant subjectively believed that he was being so threatened or that any such belief was objectively reasonable.

13

In <u>United States v. Vangates</u>, 287 F.3d 1315 (11th Cir. 2002), the Eleventh Circuit Court of Appeals discussed the impact of indirect threats of economic harm on a waiver of the right against self-incrimination and set forth the showing that must be made for a Defendant to support a <u>Garrity</u>-claim based on this type of coercion.  <u>And see</u> <u>United States v. Smith</u>, 821 F.3d 1293, 1302-04 (11th Cir. 2016) (discussing and applying <u>Vangates</u>).  Recognizing that the protection against compelled or coerced self-incrimination established by the Supreme Court in <u>Garrity</u> "is more easily applied to situations '[w]here the state has directly presented the defendant with the Hobson's choice of either making an incriminating statement or being fired,' than to cases . . . in which there has been no direct threat of termination[,]" <u>Vangates</u>, 287 F.3d at 1321 (citation omitted), the court nevertheless proceeded to state the test to be applied under the latter circumstances.

> In the absence of a direct threat, we determine whether the officer's statements were compelled by examining [his or] her belief and, more importantly, the objective circumstances surrounding it.  Thus, for [a defendant's] statements to be protected under <u>Garrity</u>, the officer "must have in fact believed [the] statements to be compelled on threat of loss of job and this belief must have been objectively reasonable.". . .  Put differently:  "First, the defendant must have subjectively believed that he [or she] was compelled to give a statement upon threat of loss of job.  Second, this belief must have been *objectively reasonable* at the time the statement was made."

14

Id. at 1321-22 (citations omitted; emphasis in original).  And see Smith, 821 F.3d at 1302 ("where there is no direct threat, the mere possibility of future discipline is not enough to trigger Garrity protection").  And, in making this determination, the court must examine "the totality of the circumstances surrounding the testimony." Vangates, 287 F.3d at 1322.  Defendant bears the "initial burden to show that the statements at issue are entitled to protection under Garrity[.]" United States v. Hampton, 2012 WL 1354579, at *17 (N.D. Ga. March 5, 2012) (citations and internal quotation marks omitted).  Defendant has not presented proof that he subjectively believed his statement was compelled under threat of economic harm nor that any such belief, if established, would have been objectively reasonable at the time the statement was made.

Although Defendant alleges that the agents' references to the Cumming Police Department's internal investigation revealed that the agents were working with the police department and "strongly suggested that federal charges would be brought" [Doc. 23 at 8-9], the record is simply devoid of any facts establishing any conduct by

AO 72A
(Rev.8/8
2)

the agents constituting an indirect threat that if Defendant did not cooperate, *for that reason*, he would lose his job.[9]

To begin with, the record simply does not support Defendant's assertions regarding what the agents said to him during the interview. Defendant states that "the agents questioning [him] *informed him* that although his supervisors had been prepared to terminate him, they convinced them to delay that action in order to prolong the investigation." [Id. at 8 (emphasis added)]. Defendant provides no record citation to support this assertion which is a blatant misstatement of the record. [Id.]. Although Agent Henley testified that the agents knew that the police department had wanted to "get rid of [Defendant] two weeks prior" to the date of the interview but asked the department to delay taking any action to allow the FBI to complete the criminal investigation (Tr. at 16-17), nothing in the record supports Defendant's statement that the agents relayed this information to Defendant during the interview. In fact, the

_____

[9]The court is at a loss to understand why the fact that federal criminal charges would likely be brought - an eventuality that the agents otherwise made pretty clear to Defendant - has anything to do with whether Garrity applies in this case. Garrity does not concern facing the fear of criminal investigations or of criminal charges. While loss of employment may very well result from being criminally charged, that is true in every case. Garrity does not protect a public employee from termination for misconduct or for committing criminal acts - it simply prohibits the employee from being threatened with losing a job for the exercise of Constitutional rights.

16

transcript of the interview refutes Defendant's contention that he was told this information.  (Gov't Exh. 2 Rev'd).

Secondly, Defendant claims that the agents "*repeatedly* advised [him] that they had been in contact with investigators employed by the Cumming Police Department about his alleged criminal conduct."  [Doc. 23 at 9 (emphasis added)].   Again, Defendant fails to provide record citations to support this assertion.  [Id.].  And the court found only two, not repeated, references by the agents to the Cumming Police Department in connection with their interview with Defendant.  The first reference was made when Agent Bigham provided Defendant with his Garrity rights.   At the beginning of the interview, Defendant mentioned to the agents that he "just found out about this" and that he had "no clue what it's even about" and that he had not yet contacted a PBA attorney.  (Gov't Exh. 2 Rev'd at 2).  Agent Bigham responded that the agents might be able to help Defendant understand.  (Id.).  Agent Bigham explained that a complaint was filed with the Cumming police department who had contacted them about the complaint.  (Id. at 2-3).  The agent then advised Defendant about his Garrity rights, explaining that the agents were conducting a criminal investigation into the complaint, that whether Defendant spoke to the agents or not had no bearing on the police department's internal investigation, and that Defendant had "every right not to

17

talk to us and your cooperation is completely voluntary . . . ." (Id. at 3).  So, although the agent referenced the internal investigation, he explained that the police department's investigation had nothing to do with the criminal investigation the agents were conducing.  The second and only other reference by the agents to the Cumming Police Department and arguably linked to the internal inquiry occurred when Defendant was asking about cooperating and Agent Bigham advised that the agents were there to listen to Defendant's side of the story but that it was Defendant's decision whether to stop the interview and obtain a lawyer.  (Gov't Exh. 2 Rev'd at 22).  The agents continued by explaining that, as a courtesy, they were interviewing Defendant in home, alone, and not at the police station where "all your buddies would see us talking to you."  (Id. at 23).  The record simply does not support this part of Defendant's argument.[10]

Supporting his claim that he subjectively believed that his statement was compelled under threat of job loss, Defendant, who offered no direct proof of his subjective beliefs, contends that two statements he made during the interview satisfies

_____

[10]And Defendant's claim that, once he became aware of the topic of the interview, the agents, who had just moments before advised Defendant that his cooperation was voluntary and unrelated to any internal police department inquiry, were required to again ask if he still wished to cooperate [Doc. 23 at 9] is not supported by legal authority, deserves no discussion and is simply merit less.

18

his burden.[11] [Doc. 23 at 9]. Defendant notes that "he specifically asked if he could contact counsel, concerned that not cooperating could '. . . hurt my chances' (Gov't Exh. [2 Rev'd] at 22)" and that "[h]e later laments that he couldn't believe he 'just threw his career away' for $6,000 (Id. at 39)." [Doc. 23 at 9]. The problem with Defendant's reliance on these statements is that they do not establish his subjective belief that the *failure to cooperate would result in loss of his job* but, instead, his belief that *his unlawful conduct resulting in criminal charges has already cost him his career as a police officer.* And Defendant's statements, in the context of an interview being conducted by members of the FBI Public Corruption Squad (Gov't Exh. 2 Rev'd at 3), evidence concerns with the impact of his decision about cooperating on the future criminal prosecution.

After Defendant corrected his misstatements to the agents about his involvement with Albo and Agent Hervey asked why Defendant had lied and told him "this is your

---

[11]Defendant's failure to testify at the hearing creates a substantial hurdle for him to overcome in establishing his subjective beliefs. See Smith, 821 F.3d at 1303-04 (noting that the defendant did not testify at the hearing and "failed to present any evidence that he subjectively believed that failing" to cooperate would result in his termination from employment); United States v. Bazile, 2013 WL 3776271, at **13-14 (N.D. Ga. July 17, 2013) (noting that at the suppression hearing the defendant failed to testify, present witnesses or evidence or elicit testimony regarding a Garrity violation).

chance," Defendant asked if he should contact "PBA."  Agent Bigham advised, "It's up to you.  I'm just trying to give you a chance to talk to us right now because I want to tell you . . . .  We've been watching you awhile, for a few months.  We've got against you, pretty strong evidence and Mr. Albo's been arrested as well.  We know everything.  By telling you this, we know everything.  Okay?"  (<u>Id.</u> at 21-22).  When the agent asked Defendant to answer questions about his criminal conduct, Defendant responded:  "Okay.  I mean is it gonna hurt my chances.  Like what's gonna happen today if I just ask for an attorney?"  Agent Bigham, noting that Defendant was a cop and knew that he had the right to do whatever he wanted, to which Defendant stated, "I understand that[,]" indicated that the agents were there to hear his side of story but that "[i]f you don't want to talk and you want an attorney, you can make that decision.  We can't - we can't guide you, okay?  I don't want to guide you."  (<u>Id.</u> at 22).  The fact that Defendant was focused on the potential criminal charges and not on whether he would lose his job if he stopped the interview is evidenced by his next question:  "Am I going to jail today?"  (<u>Id.</u>).  When told that he was not, Defendant continued the interview.  (<u>Id.</u> at 22-23).

And, as already noted, Defendant's comment that he "threw" - *past tense* - his career away for $6,000 has nothing to do with whether he cooperated with the agents

but with his *past* criminal conduct.  [Doc. 23 at 9 (citing Gov't Exh. [2 Rev'd] at 39].

Defendant actually conflates two statements that he made.  The first one he made when

he had invoked his right to an attorney and the interview was stopped by Agent

Hervey.  The agents advised Defendant not to contact anybody or do anything stupid

to jeopardize the investigation and asked Defendant to contact an attorney to have that

attorney contact the prosecutor.  (Gov't Exh. 2 Rev'd at 37-39).  Defendant then stated,

"Jesus, all for $6,000."  (Id. at 39).  Then, after Defendant decided to resume the

interview with agents admitting to conduct that was unlawful, he made the second

statement.  As the interview was being concluded, Agent Bigham stated to Defendant

that his conduct "was a bad mistake[.]"  (Id. at 40-45).  Defendant, acknowledging that

fact, stated, "This cost me my career.  Possibly my family."  (Id. at 46).  Viewing

Defendant's statements in context further dispels any reasonable inference that he

subjectively believed he was compelled to cooperate or face losing his job.

Likewise, even if Defendant had produced evidence supporting his subjective

belief, the manner in which the interview was conducted does not support a finding

that Defendant's alleged subjective belief that he must answer questions or lose his job

was objectively reasonable.  This conclusion is substantiated by the undisputed

evidence in the record that nothing was said or done by the agents that compelled

Defendant to cooperate.  He was never physically restrained or confined and was told that he was not under arrest.  The agents did not brandish or display any weapons.  (Tr. at 10-11, 32-34).  The agents did not threaten him or make him any promises.  (Tr. at 10, 34; Gov't Exh. 2 Rev'd).  The interview was conducted in his home.  (Tr. at 5-6, 16, 30, 32).  He was asked to cooperate in a criminal investigation that was unrelated to and had no bearing on any internal police department investigation.  (Tr. at 13-14, 18, 34-35; Gov't Exh. 2 Rev'd at 3).  He was advised of the nature of the investigation. (Gov't Exh. 2 Rev'd at 3-4).

Additionally, honestly advising Defendant that he was suspected of criminal activity, that he had been watched and that the agents knew about his activities and honestly advising Defendant that the agents believed he was lying and needed to start telling the truth, if he was going to continue to cooperate [Doc. 23 at 9-10 (citing Gov't Exh. [2 Rev'd] at 21-22)], simply was not coercive and did not constitute a threat of any kind, much less of economic harm for exercising his right to remain silent.  In United States v. Trevino, 215 Fed. Appx. 319, 322 (5th Cir. 2007), the court refused to find that the defendant, a correctional officer accused of sexual misconduct with female inmates, was subjected to indirect threats of economic harm which compelled his cooperation.  In so doing, the court noted that the defendant's supervisors were not

present for the interview and that he was never told his job was "in any greater jeopardy" if did not cooperate.  Id.  The court also noted that the defendant's cooperation occurred "only after being confronted with" evidence of the alleged crime - the clear inference being that he decided to cooperate not because of threats of economic harm but due to his understanding of the evidence indicating his guilt.  Id. Likewise in this case, in addition to the facts that Defendant's supervisors were not present for the interview and that he was not told that his job was in jeopardy if he failed to cooperate, it is just as reasonable to infer that his decision to cooperate was motivated by an understanding of the evidence against him and not due to any improper conduct by the agents threatening his employment.  Cf. United States v. Hipp, 644 Fed. Appx. 943, 947-48 (11th Cir. 2016) (statements to the defendant that he should tell the truth and that cooperating with the government may be beneficial or in his best interest does not render a statement involuntary but may amount to "'no more than affording [the defendant] the chance to make an informed decision with respect to [his] cooperation with the government'") (quoting United States v. Ballard, 586 F.2d 1060, 1063 (5th Cir. 1978)); United States v. Jones, 32 F.3d 1512, 1516-17 (11th Cir. 1994) (the Eleventh Circuit Court of Appeals refused to find that the arresting agents' honest assessment of the potential charges facing the defendant and the

AO 72A
(Rev.8/8
2)

sentence which could be imposed for the offenses or that discussing the potential involvement of the defendant's girlfriend in the offenses rendered the defendant's subsequent statements involuntary); United States v. Chaidez-Reyes, 996 F. Supp. 2d 1321, 1352-53 (N.D. Ga. 2014) (finding that the agents advising the defendant that they did not believe his denials of criminal activity "did not render his statements involuntary") (citing, *inter alia*, United States v. Vera, 701 F.2d 1349, 1364 (11th Cir. 1983) ("holding that 'a mere admonition to the accused to tell the truth does not render a confession involuntary'"); United States v. Barfield, 507 F.2d 53, 56 (5th Cir. 1975) (same)).  Defendant has, therefore, failed to establish that any subjective belief of threat of economic injury was "'*objectively reasonable* at the time the statement was made.'"  Vangates, 287 F.3d at 1322 (citation omitted; emphasis in original).

For these reasons, the court **RECOMMENDS** that Defendant's motion to suppress statements as involuntary under Garrity be **DENIED**.

### b.      Voluntariness

Defendant also contends that his statement was given involuntarily, in violation of the Fourteenth Amendment's Due Process Clause. [Doc. 23 at 10-11].  Defendant's argument in support of his claim is brief and conclusory.  He asserts that on "numerous occasions, the agents reminded [him] that 'he is a cop,' he 'knows how this works,'

24

and that 'this was his chance.'" [Id. at 11].[12]  According to Defendant, these statements "convinced [him] that implicating himself was the only way to avoid significant punishment."[13]  [Id.].  Defendant also contends that he was "offered the promise of lenient treatment if he cooperated [by] telling him that '[w]hoever comes to the table first wins.'"  [Id. (citing Gov't Exh. [2 Rev'd] at 38)].  Defendant also points to the agents' statement, after Defendant invoked his right to an attorney, "Don't do anything that would jeopardize this investigation.  We've - like my partner said, we've done our homework.  We have our evidence.  We've got pretty good stuff."  [Id. (citing Gov't Exh. [2 Rev'd] at 38)].  Defendant concludes his argument, without reliance on any factually apposite legal authority, with the statement that the "inference is obvious: refuse to cooperate and risk a more severe punishment in the future."  [Doc. 23 at 11].

The court finds, based on the totality of the circumstances, that the Government has established by a preponderance of the evidence that Defendant's statement was

---

[12]Defendant failed to offer citations to the transcript of the interview requiring the court to search for and find the references therein upon which Defendant is arguably relying.

[13]Again a significant hurdle for Defendant's argument is that the record is silent as to what Defendant thought about the agents' comments or why he decided to cooperate.  He did not offer testimony on this point.  Accordingly, the court would be speculating in making any factual finding about Defendant's reasons for cooperating.

25

voluntary.  See United States v. Lall, 607 F.3d 1277, 1285 (11th Cir. 2010) ("The burden is on the prosecution to establish, by a preponderance of the evidence, that a challenged confession was voluntary.").   The Supreme Court recognized "that noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where 'the behavior of . . . law enforcement officials was such as to overbear [a defendant's] will to resist and bring about confessions not freely self-determined . . . .'"  Beckwith v. United States, 96 S. Ct. 1612, 1617 (1976) (citation omitted).  It is the court's duty "'to examine the entire record and make an independent determination of the ultimate issue of voluntariness.'" Id. (quoting Davis v. North Carolina, 86 S. Ct. 1761, 1764 (1966)).  In determining whether a statement was made voluntarily, courts are to evaluate "the totality of all the surrounding circumstances--both the characteristics of the accused and the details of the interrogation." Schneckloth v. Bustamonte, 93 S. Ct. 2041, 2047 (1973); and see Lall, 607 F.3d at 1285 (same).  Those cases where courts have found confessions to be involuntary "all have contained a substantial element of coercive police conduct." Colorado v. Connelly, 107 S. Ct. 515, 520 & n.1 (1986) (citing Mincey v. Arizona, 98 S. Ct. 2408 (1978) (defendant subjected to four hour interrogation while incapacitated and sedated in intensive-care unit); Greenwald v. Wisconsin, 88 S. Ct. 1152 (1968)

AO 72A
(Rev.8/8
2)

(defendant, on medication, interrogated for over eighteen hours without food or sleep);

Beecher v. Alabama, 88 S. Ct. 189 (1967) (police officers held gun to the head of

wounded confessant to extract confession)).   "[F]actors taken into account have

included the youth of the accused, . . . his lack of education, . . . or his low intelligence,

. . . the lack of any advice to the accused of his constitutional rights, . . . the length of

detention, . . . the repeated and prolonged nature of the questioning, . . . and the use of

physical punishment such as the deprivation of food or sleep . . . ."  Schneckloth, 93

S. Ct. at 2047 (citations omitted); and see United States v. Small II, 2013 WL 1400610,

at *5 (M.D. Fla. February 11, 2013) (finding that the defendant's "prior experience

with the criminal justice system belie[d] his assertion that his statements were not

knowingly and voluntarily made"); United States v. Myers, 2009 WL 579389, at * 5

(N.D. Ga. March 5, 2009) (noting that "prior experience with the criminal justice

system" is also a factor to be considered).  "'Sufficiently coercive conduct normally

involves subjecting the accused to an exhaustingly long interrogation, the application

of physical force or the threat to do so, or the making of a promise that induces a

confession.'"  United States v. Thompson, 422 F.3d 1285, 1295-96 (11th Cir. 2005)

(citation omitted).

27

Before addressing Defendant's references to the agents' statements, the court notes that none of the factors identified by courts finding that a confession is involuntary are present in the instant case and that, in fact, the circumstances of the interview indicate that Defendant, being aware - not only based on his career in law enforcement but also because of the agents' admonitions to him - that he did not have to speak to the agents, voluntarily cooperated.  The agents arrived at Defendant's residence in the middle of the afternoon and asked and were allowed to enter his residence.  (Tr. at 5-6, 16-17).  Defendant, unrestrained, sat with the agents at his dining room table.  (Tr. at 6, 10, 32-33).  He was not handcuffed nor threatened with physical harm or injury.  (Tr. at 10, 33-34).  The agents did not display or brandish firearms.  (Tr. at 11, 33).  He was advised that the interview, part of a criminal investigation, was voluntary.  (Tr. at 13, 35; Gov't Exh. 2 Rev'd at 3).  And he was advised more than once that he was not under arrest and would not be arrested that day.  (Tr. at 11,33-34; Gov't Exh. 2 Rev'd at 22, 36).  The agents' tone during the interview was conversational.  (Tr. at 11, 34).  As noted, Defendant, a law enforcement officer, was well aware - as he acknowledged - of his rights and quite likely was less susceptible to being influenced by the agents than an average citizen.  (Tr. at 12; Gov't Exh. 2 Rev'd at 22).

28

And the statements relied on by Defendant, taken out of context, do not support Defendant's arguments.  Contrary to Defendant's contention, the agents' statements or inferences to the effect that Defendant knew how the system worked, that the interview was his chance to cooperate, that deciding to cooperate may have benefits and that the case against Defendant was strong, simply do not constitute either threatening Defendant with prosecution or a more severe sentence or promising leniency if he did cooperate.  Instead, the court finds, considering the totality of the circumstances, the agents' comments "amounted to 'no more than affording [Defendant Van Buren] the chance to make an informed decision with respect to [his] cooperation with the government.'"  <u>Hipp</u>, 644 Fed. Appx. at 948 (citation omitted).

The record establishes that, after advising Defendant that his cooperation was voluntary, the agents asked Defendant questions about the nature of his involvement with the victims of the extortion and that Defendant's responses minimized his association and indicated that he only met with them in his official capacity.  (Gov't Exh. 2 Rev'd at 3-20).  When Defendant persisted in denying other involvement with these individuals, Agent Hervey advised Defendant that the agents had been watching him for a few months and stated, "You're lying to us."  (<u>Id.</u> at 20-21).  When Defendant asked lying about what, the agent stated, "You know how this works.  You

29

can either continue to lie to us or you can cooperate with us.  We've been listening to your calls.  We've been watching you, we've been following you.  I need you to start telling us the truth." (Gov't Exh. 2 Rev'd at 21).  The agent gave Defendant the option of doing whatever Defendant wanted to do being aware of the circumstances.  Having this choice presented to Defendant, the agent continued to ask Defendant questions, which he answered truthfully.  (Id. at 21).  Only when the agent asked Defendant why he had lied did Defendant bring up the subject of continued cooperation and his status.

Agent Bigham again advised that whether Defendant cooperated was up to him and that the agents were "just trying to give you a chance to talk to us right now because I want to tell you . . . .  We've been watching you awhile, for a few months. We've got against you, pretty strong evidence and Mr. Albo's been arrested as well. We know everything.  By telling you this, we know everything. . . . So let's talk about your all's two relationship and let's talk about what went on.  Let's go ahead and let's get it out on this table.  I think you need to just start being honest with us." (Id. at 21-22).  The agent did not lie to Defendant about the investigation but, instead, offered an honest assessment of the evidence facing Defendant.  Defendant responded by asking, "I mean is it gonna hurt my chances.  Like what's gonna happen today if I just ask for an attorney?"  Agent Bigham responded,  "Here's the deal.  You're a cop, okay.  You

30

know you have every right to do what you want to do."  After Defendant confirmed

that he understood his rights, the agent continued, "So I mean if you want to talk to us,

we're here.  We're here now.  We want to listen.  We want to hear what your side of

the story is.  If you don't want to talk and you want an attorney, you can make that

decision.  We can't - we can't guide you, okay?  I don't want to guide you."  (<u>Id.</u> at 22-

23).  And, after the agents confirmed that Defendant was not being arrested, he decided

to continue to cooperate.  (<u>Id.</u> 23-36).  The agents' comments again made it clear that

the decision to cooperate was up to Defendant and that they could not tell him what to

do but that they were offering him that opportunity.

Defendant only asked, again, whether he was going to be arrested and should he

continue to cooperate or call an attorney - to which the Agent Hervey responded that

the decision was Defendant's - after he had admitted misusing his authority to run a

tag for the $1,000 he received from Albo.  (<u>Id.</u> at 36).  Concerned about Defendant's

inquiries about continuing to cooperate, Agent Bigham stated, "You keep asking and

I want you to feel comfortable and I don't want you to think that we're sitting here

trying to force you to talk to us.  You make the decisions.  Like I told you at the very

beginning, your cooperation is voluntary.  I mean you are very nice and let us come

inside . . . but you know, this is our - I mean you're a cop.  You know how it works.

AO 72A
(Rev.8/8
2)

We come to you.  We want to find out . . . .  But you keep asking, so I mean you make that decision. . . ."  (Id. at 36-37).  The agent wanted to be sure that Defendant did not feel pressured and straightforwardly repeated the options available to Defendant: cooperate or invoke his rights.

When Defendant stated that he wanted to contact an attorney, Agent Hervey honoring Defendant's request advised Defendant not to talk because he said he wanted a lawyer, and the agent stopped the interview stating, "You invoked your rights to an attorney."  (Id. at 37-38).  In fact, the agent gave Defendant contact information for his attorney to contact the United States Attorney and cautioned Defendant about harming himself and about jeopardizing the investigation.  (Id. at 38).  In this context of Defendant hiring a lawyer - or having one appointed - who would contact the prosecutor, the agent advised Defendant, "So the best thing, like I say, you know how it works, you're a cop.  Whoever comes to the table first wins.  Okay.  We're stopping the interview.  You want a lawyer so I don't want you to say anything else to us, all right."  (Id. at 38-39).  Again, the agent's statement was not intended to mislead or pressure the Defendant but to confirm what Defendant already knew about how cooperation - this time with an attorney - worked.

32

A little later, as the agents were leaving and having provided Defendant with contact information and asking for his attorney to contact them or the prosecutor, Agent Hervey then stated, "Either way [inaudible] make that decision for you.  All I ask of you is continue whatever you do from this point is be honest with us for the rest of the investigation." (Id. at 40).  Defendant then asked, "Should I continue talking to you?" (Id.).  To which Agent Hervey responded, "Do you want to revoke your rights to - continue to talk to us?"  (Id.).  And Defendant stated, "At this time, yes." (Id.).  So the agents and Defendant returned to the dining room table to continue the interview with Defendant.  (Id. at 40-46).  Defendant made the decision to continue to cooperate without an attorney.

Confronting Defendant with the fact that the agents believed that he was lying and explaining why they believed he was lying did not constitute improperly threatening Defendant.  See, e.g., Hipp, 644 Fed. Appx. at 947-48 (admonishing a defendant to tell the truth does not render a statement involuntary); United States v. Kimbrell, 2015 WL 4641533, at *19 n.17 (N.D. Ga. August 4, 2015) (advising the defendant that he was lying and encouraging him to tell the truth did not render his statements involuntary); Chaidez-Reyes, 996 F. Supp. 2d at 1352-53 (same).  And giving Defendant Van Buren an opportunity, in fact, even encouraging Defendant, to

33

cooperate, after explaining the nature of the evidence gathered against him, did not constitute improper threats or inducement.  There is no evidence in the record that the agents threatened Defendant with a more harsh punishment if he declined to cooperate or that they made a promise of leniency in exchange for cooperation.  Eleventh Circuit case law is clear: "A statement made by a law enforcement agent to an accused that the accused's cooperation would be passed on to judicial [or prosecuting] authorities and would probably be helpful to him is not a sufficient inducement so as to render a subsequent incriminating statement involuntary." United States v. Davidson, 768 F.2d 1266, 1271 (11th Cir. 1985).  See, e.g., Hipp, 644 Fed. Appx. at 947 (advising the defendant "that cooperating truthfully would be in his 'best interest'" or "a general statement that cooperation may be beneficial to an accused, with no promise of leniency, does not amount to an illegal inducement"); Jones, 32 F.3d at 1517 (noting that the defendant "appear[ed] to have characterized *information*[, including that he was facing federal prosecution and a mandatory sentence and that his girlfriend appeared to implicated in the criminal conduct,] conveyed to him by the interviewing agents as threats[,]" the court stated that "[n]ot only was th[e] information true, but also such comments or information would not render [the defendant's] subsequent statements involuntary") (emphasis in original); United States v. Mendoza-Cecelia,

34

963 F.2d 1467, 1475 (11th Cir. 1992) ("discussions of realistic penalties for cooperative and non-cooperative defendants . . . are normally insufficient to preclude free choice"), recognizing abrogation on other grounds Coleman v. Singletary, 30 F.3d 1420, 1423-24 (11th Cir. 1994); Ballard, 586 F.2d at 1063 ("Encouraging a suspect to tell the truth and suggesting that his cohorts might leave him 'holding the bag' does not, as a matter of law, overcome a confessor's will, even though he or she may be sixteen years of age. . . .  Neither is a statement that the accused's cooperation will be made known to the court a sufficient inducement so as to render a subsequent incriminating statement involuntary."); Myers, 2009 WL 579389, at *6 (the agents' statements "advis[ing] the Defendant of the realistic consequences of his actions and urg[ing] his cooperation because it may be helpful to him" or "inform[ing] the [D]efendant of realistically expected penalties for cooperation and/or non-cooperation" does not render his statement involuntary).

For these reasons, the court finds that Defendant non-custodial statement was voluntary and **RECOMMENDS** that Defendant's motion to suppress statements be **DENIED**.

III.    **Conclusion**

For these reasons and cited authority, the court **RECOMMENDS** that Defendant's motion [Doc. 13] to suppress his statement be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO RECOMMENDED**, this 11th day of January 2017.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

36